UNITED STATES of America

v.

**Gaetano VASTOLA, et al., Defendants.**

**Crim. A. No. 86–301(SSB).**

United States District Court,
D. New Jersey.

May 6, 1988.

Office of the U.S. Attorney by Bruce Repetto, Donald Davidson, Asst. U.S. Attys., Newark, N.J., Michael B. Pollack, New York City, for defendant Canterino.

Paul, Weiss, Rifkind, Wharton & Garrison by Martin London, Stuart M. Cobert, New York City, for defendant Levy.

Leon Borstein, New York City, for defendant Fisher.

Gibson, Dunn & Crutcher by Robert D. Sack, Rex S. Heinke, Kelli L. Sager, New York City, for William E. Knoedelseder, Jr.

Brown & Connery by Warren W. Faulk, Westmont, N.J., for Dan E. Moldea.

## OPINION

BROTMAN, District Judge:

### I. INTRODUCTION

Count 1 of the redacted indictment underlying this prosecution alleges that defendants Morris Levy, Howard Fisher and Dominick Canterino conspired with Gaetano Vastola to use physical violence against John LaMonte in an attempt to extort funds from LaMonte. In furtherance of this conspiracy, the government alleges that John LaMonte was beaten by Gaetano Vastola on May 18, 1985. Defendants contend that the government does, or at least at some point did, possess surveillance photographs of the alleged beating, which the government is required to make available to the defense, pursuant to Rule 16(a)(1)(C) of the Federal Rules of Criminal Procedure and the Supreme Court's holding in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The government vehemently denies that surveillance evidence of this incident ever existed.

As a result, defendants Levy, Fisher and Canterino moved for an evidentiary hearing to determine whether the government possessed photographs of the LaMonte beating. That motion was granted by order of this court dated March 3, 1988, 680 F.Supp. 709, and an evidentiary hearing was commenced on March 10, 1988 and continued on March 17, 1988 (hereinafter referred to as the *"Brady* hearing"). At the close of the proceedings on the 17th, two interrelated issues required resolution: (1) whether further evidence should be adduced on the issue of the existence of the sought-after surveillance material and, if so (2) whether subpoenas served by defendants on two journalists, William Knoedelseder and Dan Moldea (hereinafter referred to collectively as "Reporters"), for the purpose of compelling their testimony at the *Brady* hearing, should be quashed on the basis of the Reporters' privilege.

For the reasons that follow, the court is satisfied that no surveillance of the alleged May 18, 1985 beating occurred. Therefore, the *Brady* hearing will not be reopened, and the Reporters' motion to quash the subpoenas served on them will be granted.

### II. PROCEDURAL HISTORY

In support of their motion for an evidentiary hearing, the defendants proffered several factual circumstances that gave rise to a genuine issue of material fact as

to whether the May 18, 1985 beating of John LaMonte was surveilled and/or photographed by the Federal Bureau of Investigation (hereinafter referred to as the "F.B. I."). Upon receiving this proffer, the court ordered that the *Brady* hearing be conducted. Additionally, the government was directed to submit to the court, for an *in camera* review, the names of those law enforcement agents assigned to the investigation of Gaetano Vastola and other co-defendants on the day of May 18, 1985, as well as any logs, reports or duty rosters which indicate the location of those agents on that date.

After the court reviewed these *in camera* submissions, the parties were notified, in a letter dated March 15, 1988, that the court had "concluded that none of the documents turned over by the government indicate the existence of surveillance evidence of the alleged beating of John LaMonte on May 18, 1985." That letter did, however, provide defendants with the names of those F.B.I. agents assigned to the investigation underlying this prosecution who were on duty on May 18, 1985. Those agents were John J. Mahoney, David E. Von Holle and Robert C. McGonigel.

On March 10, 1988, the court heard oral argument on the Reporters' motion to quash and also took testimony from Dennis Eisman, John LaMonte's lawyer. At the end of that proceeding, the court continued the *Brady* hearing until March 17, 1988, and reserved on the Reporters' motion to quash.

On March 17, 1988, testimony was adduced from the following witnesses: (1) Lane Bonner, Chief of the Press Office at F.B.I. headquarters; (2) Agent Mahoney; (3) John LaMonte; and (4) Donald V. North, Supervising Special Agent in the Organized Crime Section at F.B.I. Headquarters. Following that testimony, the court heard further oral argument by the parties, and then reserved decision on the motion to quash the subpoenas served on the Reporters and the question of whether a continuation of the *Brady* hearing was warranted.

## III. DISCUSSION

Before evaluating the evidence presented both prior to and during the *Brady* hearing to determine whether enforcement of the subpoenas served on the Reporters and/or further proceedings on the issue of the existence of surveillance are necessary, it is important to emphasize the court's purpose in having granted defendant's motion for an evidentiary hearing. It is well established that,

> [i]n the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland*, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed. 2d 215], it is the [government] that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.

*Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987).

In the present case, defendants alerted the court to the possible existence of photographs of the alleged beating of John LaMonte at the hands of Gaetano Vastola—items to which, as the government conceded during the February 25, 1988 oral argument on the motion for an evidentiary hearing, the defendants would be entitled. This court then found that defendants' proffer, as detailed in Part III(A) of this opinion, raised a genuine issue of disputed fact as to the existence of these photographs and, accordingly, directed that a hearing be held, which would be "strictly limited to material which is relevant to the existence of surveillance evidence of the alleged beating of John LaMonte on May 18, 1985." *United States v. Vastola*, 680 F.Supp. 709 (D.N.J.1988). The Third Circuit has approved this approach for insuring that the prosecution has not wrongly withheld exculpatory evidence. *Virgin Islands v. Martinez*, 780 F.2d 302, 306 (3d Cir.1985); *United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir.1977), *cert. dismissed*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1978).

Obviously, this type of proceeding has inherent limitations. That is to say, having embarked on such a fact-finding mission, the court must recognize that the search will be self-terminating only in the event that the existence of the photographs is conclusively proven. In the absence of such conclusive proof, the taking of testimony and the introduction of evidence could conceivably continue indefinitely, in an unending quest to establish a negative. The need to avoid this sort of pretrial trial is patent.

As a result, it is left to the court to satisfy itself to a reasonable degree as to the non-existence of the sought-after material and, upon doing so, end the inquiry. This method provides defendants with a court determination of the *Brady* issue based on "a hearing appropriate to the factual inquiry," *United States v. Alexander*, 748 F.2d 185, 193 (4th Cir.1984), and defendants are entitled to nothing more.

### (A) *Defendants' Original Proffer*

Defendants submitted, in support of their motion for an evidentiary hearing, affidavits and exhibits which outlined the following factual circumstances.

First, defendants pointed to the testimony of F.B.I. Agent Mahoney, given during the bail hearing for Gaetano Vastola. That testimony indicates that the F.B.I. began periodic surveillance of Vastola and others four months prior to the date of the alleged beating of John LaMonte, that the F.B.I. had discovered through their surveillance that Vastola intended to physically harm LaMonte, and that Agent Mahoney and an Agent Thomas Cupples notified LaMonte of this discovered threat of harm, in an effort to recruit LaMonte into the Federal Witness Protection Program. Defendants argue in the affidavit of Martin London, Esquire, counsel for defendant Levy, that, "[i]n light of the F.B.I.'s demonstrated concern for LaMonte's safety and their ongoing surveillance of Vastola, it would be difficult to accept that LaMonte attended the meeting with Vastola by himself, unwatched, unrecorded." *See* London Affidavit at ¶ 6.

Second, defendants submitted a passage from a book entitled *Dark Victory: Ronald Reagan and the Mob,* authored by Dan Moldea, which states that the F.B.I. photographed the LaMonte beating. Defendants also presented the affidavit of Stuart M. Cobert, Esquire, one of the counsel for defendant Levy, which recounts a conversation between Cobert and Moldea wherein Moldea told Cobert that his source of information for the above passage was a Los Angeles Times reporter by the name of William Knoedelseder. *See* Cobert Affidavit at ¶ 3. The Cobert affidavit also indicates that Moldea said that he spoke with sources at the F.B.I., who told Moldea that the F.B.I. had "memorialized" the alleged beating, but that Moldea refused to divulge the identity of these sources. *Id.*

Third, defendants provided an article written by William Knoedelseder, which appeared in the Los Angeles Times on March 3, 1986. The article asserts that the May 18, 1985 incident was photographed by the F.B.I. Additionally, the affidavit of Leon Baer Borstein, Esquire, counsel for defendant Fisher, submitted in support of defendants' motion, states that Borstein spoke with Knoedelseder, who told him that the source of his information regarding photographs of the LaMonte beating was Dennis Eisman, Esquire, attorney for John LaMonte. *See* Borstein Affidavit at ¶ 6. The Borstein affidavit also indicates that Knoedelseder refused to tell Borstein whether the F.B.I. had confirmed or denied the Los Angeles Times article, but that Knoedelseder had told Borstein that he was a "careful reporter." *Id.*

Fourth, defendants submitted the complaint filed in a civil action captioned *Scorpio Music, Inc. v. MCA Corp.,* C.A. # 85–1591 (E.D.Pa.), which was signed by Dennis Eisman and alleges that the beating of LaMonte was photographed by the F.B.I. Also, the Borstein affidavit states that Eisman told Borstein that the former had been informed by one of more F.B.I. agents that they had observed and photographed the May 18, 1985 incident.

Finally, something not brought out by defendants, but that appears in the tran-

script of the Vastola bail hearing, which was submitted as an exhibit by defendants, bears noting at this time. That is, following his meeting with Vastola, LaMonte called Agent Cupples, who picked up LaMonte and took him to the hospital for treatment of head injuries that LaMonte had sustained. Furthermore, Cupples took photographs of LaMonte, both before LaMonte was admitted and after he was released from the hospital. These photographs were introduced by the government at the Vastola bail hearing.

(B) *The Evidence Presented At The Brady Hearing*

The court makes the following findings of fact, predicated on the substantially uncontradicted testimony of Agent Mahoney and John LaMonte adduced at the *Brady* hearing on March 17, 1988.

1. Based on surveillance information obtained by the F.B.I. during their investigation of Gaetano Vastola and others named in the indictment herein, Agents Mahoney and Cupples met with LaMonte two to four weeks prior to May 18, 1985, and informed him that they believed he was in danger of getting a beating from Vastola. (T. 3/17/88—Mahoney at 53-54; LaMonte at 102).[1] Despite this warning, LaMonte, who did not feel that he was in danger, told Agents Cupples and Mahoney that he could "handle himself." (T. 3/17/88—Mahoney at 53-54; LaMonte at 107-108).

2. On May 18, 1985, at approximately 11:00 a.m., LaMonte left his home by car and drove to a meeting with Vastola that was to take place in the parking lot of a hotel located in Hightstown, New Jersey. (T. 3/17/88—LaMonte at 95). On his way to the hotel, LaMonte missed the Hightstown exit off the New Jersey Turnpike, and had to make a U-turn at the toll booth at the next exit, in order to backtrack. In doing this, LaMonte noticed another car making a similar U-turn at the toll booth. LaMonte then got back on the turnpike, exited at Hightstown, and proceeded to the

hotel parking lot. (T. 3/17/88—LaMonte at 98).

3. Before reaching the hotel parking lot, as he drove down the Hightstown exit ramp, LaMonte saw a uniformed policeman standing beside a car that was parked under the overpass. This overpass was approximately 100 yards from the hotel parking lot. The policeman was standing near the front of the car, looking across the road, not in the direction of the motel. (T. 3/17/88—LaMonte at 101).

4. Upon pulling into the hotel parking lot, LaMonte saw the car that had made the U-turn at the toll booth right after he had driven past. LaMonte was not able to identify the car or its occupants, nor did he ever see that car again. (T. 3/17/88—LaMonte at 98).

5. During his meeting with Vastola, LaMonte glanced up at a utility pole and saw a man perched atop it. LaMonte did not notice what the man was wearing or whether he had tools or equipment with him. (T. 3/17/88—LaMonte at 102).

6. The meeting between LaMonte and Vastola lasted approximately 15 minutes to a half hour. LaMonte did not take further notice of either the policeman under the overpass or the man on the utility pole. (T. 3/17/88—LaMonte at 116, 117).

7. LaMonte's sighting of the car making the U-turn, the policeman under the overpass, and the man on the utility pole gave rise to the suggestion in his mind that the meeting between him and Vastola might be under surveillance. (T. 3/17/88—LaMonte at 104-105). Some time after May 18, 1985, LaMonte asked Agent Cupples whether the meeting had been surveilled. Cupples told him that it had not. (T. 3/17/88—LaMonte at 104).

8. On May 16 or 17, 1985, Agent Mahoney, who acted as the case agent in charge of physical surveillance pertaining to the investigation that led to the indictment in this case, requested a surveillance for May

1. Page citations refer to the transcript of the *Brady* hearing which took place on March 10, 1988 and on March 17, 1988.

18, 1985. This request was made on the basis of the following:

MAHONEY: That Sonny [Palmer] Brocco and Tommy [Gaetano] Vastola wanted to meet with him [LaMonte] and there had been some discussion that he [LaMonte] was going to have a problem that day and we had no way of knowing, we couldn't find out where it was, where exactly it was set for, so our best way of doing that would be we thought to follow Sonny Brocco to the meeting.

(T. 3/17/88—Mahoney at 53). Mahoney did not know when the expected meeting between Vastola and LaMonte was scheduled to take place. (T. 3/17/88—Mahoney at 54).

9. At approximately 7:30 a.m. on May 18, 1985, Agent Mahoney left his house in Colts Neck, New Jersey by car to drive to the F.B.I. office in Red Bank, New Jersey. At some time that morning, either on his way to work or shortly after arriving at the Red Bank office, Mahoney drove toward the Marlboro Airport coffee shop, in order to get some coffee. While en route to the coffee shop, Mahoney saw Vastola pass by in a car, "heading for the Freehold area." (T. 3/17/88—Mahoney at 55).

10. Upon seeing Vastola, Mahoney radioed the surveillance team which he had assigned to "the Freehold/Howell Township area," and "alerted them that Tommy Vastola had passed [him], that he was heading in a westerly direction, just to alert them that he may be coming in their direction, that something might be moving, to be more alert." (T. 3/17/88—Mahoney at 56).

11. After contacting the surveillance team and receiving acknowledgement of his message, Mahoney proceeded to the coffee shop. On the way, the surveillance team radioed back to Mahoney, and told him that they could not locate Vastola. Mahoney then went to the coffee shop and had breakfast. (T. 3/17/88—Mahoney at 57).

12. After breakfast, Mahoney returned to the Red Bank office and did paperwork for the remainder of the day. In the course of the next day or two, Mahoney

spoke with the surveillance team leader, Agent Von Holle. Von Holle told Mahoney that the team had never seen LaMonte, Vastola or Brocco, and that "they never were able to make any type of surveillance that day." (T. 3/17/88—Mahoney at 58).

Further testimony presented at the *Brady* hearing addressed the issue of the basis Dennis Eisman had for alleging in the *Scorpio* complaint that "LaMonte's beating was photographed by F.B.I. agents...." Eisman took the stand on March 10, 1988 and testified to the following:

(a) that before filing the *Scorpio* complaint, he made an investigation of the allegations contained therein (T. 3/10/88—Eisman at 22);

(b) that he could not remember all the persons with whom he spoke before reaching the conclusion that the LaMonte beating had been photographed (T. 3/10/88—Eisman at 25);

(c) that he did recall speaking to William Knoedelseder and Agent Mahoney regarding the May 18, 1985 incident (T. 3/10/88—Eisman at 26); and

(d) that, while nobody had told Eisman that the actual alleged beating of John LaMonte had been photographed (T. 3/10/88—Eisman at 39), he "assumed that there were surveillance photographs of the beating." (T. 3/10/88—Eisman at 28).

Eisman then offered an explanation in the following colloquy, of how he reached that assumption.

CROSS-EXAMINATION OF MR. EISMAN BY MR. BORSTEIN:

Q. You said you concluded it from the description to me of the circumstances of the events.

Could you please tell me what description was given to you, and by whom of the circumstances of the events?

A. At that point in time, 1986, when I filed the complaint, I was aware of the large scale investigation going on by all the law enforcement agencies I described, and some others. I think I was aware of intense electronic surveillance that had been going on prior to the meeting. I was aware that the law enforce-

ment authorities had prior knowledge of the meeting. I was aware that law enforcement authorities had intense physical surveillance on many, if not all of these individuals including the fact that shortly before I filed that complaint, one of the individuals involved in the overall conspiracy had murdered or was accused of murdering one of the surveillance agents.

I was aware that my client had been approached by the F.B.I. of danger to him prior to the meeting. I was aware that there were electronic surveillance which recorded threats to my client. I was aware, from my own experience in these matters, that with all the information the authorities had, there was probably either an informant or agent within some part of this organization and/or electronic surveillance which was also giving them information. I was aware that immediately after the beating they visited my client at the hospital.

THE COURT: Who is they?

THE WITNESS: The F.B.I.

And, I was aware of the beating and aware of the circumstances of the beating.

I had been told, because I was interested, that because I had been given information or read in the newspaper there were photographs of the beating, whether there were in fact photos and confirmed to me there were photographs. But the information which I received at that point was not in great detail about what the photographs were, except the photographs, there were photographs existing, and they would be provided when they were provided to everybody else, because indictments had not been handed down in this case. I assumed they were grand jury information or grand jury.

THE COURT: Photographs of the appearance of the individual or the actual striking?

THE WITNESS: I was never given—I had even read in the newspaper there were photographs of the striking and confirmed to me there were photographs. I think I added one and one and maybe got three, but, based upon all the other

information and my experience, at that time, that's what I believed was, and the published stories that had appeared, I believed—prior to filing of the complaint they were never denied by the authorities. So, based upon all of those factors and my experience, I concluded that number one, to the best of my knowledge and ability, number one, there was surveillance, and two, the fact that there were photographs of the incident if there had been surveillance. Knowing how the —how usually efficient the government is.

(T. 3/10/88—Eisman at 39–41).

Based on this testimony of Dennis Eisman, the court finds that:

13. Eisman did not obtain the information that the F.B.I. had surveillance photographs of the actual alleged beating of John LaMonte from Agent Mahoney, William Knoedelseder or any other person, and that the allegation in the *Scorpio* complaint that such photographs were taken was based on an erroneous assumption on the part of Eisman.

Finally, based on the uncontradicted testimony of Lane Bonner and Donald North which was given at the March 17, 1988 portion of the *Brady* hearing, the court makes the following findings of fact:

14. Bonner, in his capacity as Chief of the F.B.I. Press Office in Washington, D.C., spoke with Knoedelseder in late 1985 about "specific information" that Knoedelseder had regarding the then ongoing investigation of the defendants in this case. (T. 3/17/88—Bonner at 31–32).

15. Upon learning that Knoedelseder had this "specific information," Bonner contacted Donald North, who was then the Supervising Special Agent in the Organized Crime Section of the Criminal Investigative Division at F.B.I. Headquarters in Washington, D.C. (T. 3/17/88—Bonner at 35–37).

16. North and Bonner met with Knoedelseder on at least two occasions, and discussed the information that Knoedelseder had. North and Bonner asked Knoedelseder at one of these meetings if he would "hold off on reporting the story" so as not

to jeopardize the ongoing investigation. Knoedelseder agreed. (T. 3/17/88—Bonner at 37–38; North at 119–121).

17. In addition to meeting twice with Knoedelseder, Bonner had four or five telephone conversations with Knoedelseder, over the course of the period from October 1985 up until the time the indictment in this case was filed. (T. 3/17/88—Bonner at 39).

18. Bonner recollects that, during either his two meetings with Knoedelseder or his four or five phone conversations with him, that someone mentioned that "someone was allegedly either threatened or beaten." Bonner does not recall who mentioned this to him. (T. 3/17/88—Bonner at 38).

19. At no time did Knoedelseder ask Bonner or North whether the May 18, 1985 incident had been surveilled, nor did Bonner or North discuss with Knoedelseder the statement to that effect that appeared in the Los Angeles Times article of March 3, 1986. (T. 3/17/88—Bonner at 43–44; North at 122–123).

(C) *The Need To Have The Reporters Testify*

As the foregoing findings of fact indicate, two of the four sets of factual circumstances which initially gave rise to a genuine issue of material fact regarding the existence of surveillance photographs have been explained by evidence adduced at the *Brady* hearing, so that they no longer support the conclusion that the alleged beating of LaMonte was surveilled. First, the F.B. I.'s ongoing periodic surveillance of Vastola and other co-defendants, coupled with the F.B.I.'s belief that Vastola intended to meet with LaMonte and cause him physical harm, had given rise to the permissible inference that the F.B.I. surveilled the May 18, 1985 meeting. This inference was rebutted, however, by Mahoney's testimony that the F.B.I. did not know the scheduled time or location for the Vastola–LaMonte meeting, and that the F.B.I.'s efforts to surveil that meeting were unavailing. The initial inference was further rebutted by the court's conclusion that none of the documents contained in the government's *in*

*camera* submission indicate the existence of surveillance evidence.

Second, the assertion in the *Scorpio* complaint lent support to the theory that photographs of the beating existed. This piece of evidence was subsequently met with the testimony of Eisman, who explained that the complaint allegation was based on an erroneous assumption on his part that the photographs, which he was told had been taken on May 18, 1985, actually depicted LaMonte being beaten.

Therefore, the only unrebutted evidence remaining in the record that supports defendants' position are the cited passages from the Moldea book and the Knoedelseder article. On the strength of this evidence, defendants ask the court to compel the Reporters to testify and to disclose their confidential sources.

The Third Circuit has held that journalists have a federal common law qualified privilege, arising under Rule 501 of the Federal Rules of Evidence, to refuse to divulge their confidential sources. *Riley v. City of Chester*, 612 F.2d 708, 715 (3d Cir.1979). Furthermore, this privilege has specifically been found to apply in the context of a criminal proceeding. *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir.1980) ("The authors of the Bill of Rights did not undertake to assign priorities as between First Amendment and Sixth Amendment rights, ranking one as superior to the other. . . .").

In the present case, both the Reporters and defendants concur that the Third Circuit has recognized this qualified privilege. Both also agree that defendants must establish that three criteria are met before that privilege is overcome: (1) that the material sought provides a source of crucial information going to the heart of defendants' claim; (2) that defendants made an effort to obtain information from alternative sources; and (3) that the only access to the information sought is through the Reporters and their sources. *United States v. Criden*, 633 F.2d 346, 358–59 (3d Cir.1980); *Riley*, 612 F.2d at 716–17; *Cuthbertson*, 630 F.2d at 48. Defendants can-

not get past the first prong of this three-part test.

While defendants argue that the Reporters can provide information that is crucial for resolution of their *Brady* claims, this court does not believe that the compelled testimony of Moldea or Knoedelseder will conclusively establish either the existence or non-existence of photographs of the La-Monte beating. This conclusion rests on several factors.

First, the Borstein affidavit indicates that Knoedelseder's source for information regarding the May 18, 1985 incident was Dennis Eisman. *See* Borstein Affidavit at ¶ 6. As outlined earlier in this opinion, Eisman has admitted under oath that his original belief regarding surveillance of the LaMonte beating was based on an assumption, and not on any direct information, and that the assumption could well have been mistaken. Furthermore, it is unclear whether the relevant part of Knoedelseder's story was ever confirmed by the F.B.I. Consequently, it is quite possible that the Knoedelseder article is nothing more than a restatement of Eisman's original unsubstantiated conclusion.

Similarly, the Cobert affidavit indicates that Moldea originally got his information from Knoedelseder. *See* Cobert Affidavit at ¶ 3. Although Moldea told Cobert that F.B.I. sources had informed him that the F.B.I. had "memorialized" the incident, this memorialization could easily refer to the photographs of LaMonte taken by Agent Cupples after the alleged beating. Therefore, Moldea's belief that the incident itself was photographed could well have been based on the same good faith misapprehension previously held by Eisman and passed on to Knoedelseder.

Second, even if the Reporters were to testify that they had received specific confirmation from F.B.I. sources that the La-Monte beating had been surveilled and/or photographed, this information alone would not prove defendants' claim. On the contrary, such testimony would only be indicative of what someone told the Reporters, and would not be direct evidence on the crucial issue—whether the alleged beating was surveilled.

■ Finally, evidence has been obtained through the testimony thus far adduced at the *Brady* hearing that supports the conclusion that no surveillance photographs were taken. Much of this evidence came from the testimony of Agent Mahoney, the person responsible for supervising all physical surveillance related to the investigation leading up to this prosecution. It is therefore speculative at best for defendants to argue that compelling the Reporters to divulge their sources at this time would disprove this conclusion. As a result, the subpoenas served on the Reporters will be quashed.

**(D)** *The Need To Reopen The Brady Hearing*

■ Defendants have submitted a supplemental affidavit of Stuart Cobert, in support of their request that the *Brady* hearing be reopened for the purpose of adducing additional testimony. The court does not believe that such further proceedings are necessary.

As stated earlier, the court has determined that the evidence presented in the submissions of the parties and at the *Brady* hearing does not indicate that the F.B.I. surveilled the alleged beating of LaMonte on May 18, 1985. And while the absence of surveillance has not been conclusively proven, defendants have been given an ample opportunity to establish the fact of surveillance and have failed to do so.

Defendants now press for a further inquiry, stating, by way of the supplemental Cobert affidavit, that they have a witness who will testify that (a) Knoedelseder spoke with two other F.B.I. agents;[2] (b)

---

**2.** Defendants claim that this testimony regarding Knoedelseder's previously undiscovered contacts with two F.B.I. agents will indicate that "the government has failed to live up to its representation that it would produce at the hearing all agents who had spoken to Knoedelseder." *See* Supplemental Cobert Affidavit at ¶ 2. This assertion badly mischaracterizes what was said by the government at the March 10, 1988 proceeding. The Assistant United States

that one of those agents told the prospective witness that the F.B.I. "saw" and taped the May 18th incident; and that (c) Knoedelseder told the prospective witness that F.B.I. agents told him they "saw" the May 18th incident. The speculative probativeness of such second and third-hand accounts has already been discussed in the context of the Reporters' motion to quash. Moreover, the court must note that defendants were given the names of two F.B.I. agents who were specifically assigned the responsibility of surveilling Gaetano Vastola on the day in question—Agents Von Holle and McGonigel. Having chosen not to call these men as witnesses at the *Brady* hearing, defendants' present application to reopen the proceeding, in order to hear the testimony of witnesses who were not directly involved with the surveillance efforts on May 18, 1985, rings hollow.

In light of the foregoing, the court will terminate the *Brady* hearing, and the Reporters' motion to quash the subpoenas served on them will be granted. An appropriate order will be entered.

## ORDER

This matter having come before the court on March 10, 1988 and March 17, 1988 in a hearing to determine whether surveillance photographs were taken by the F.B.I. of the alleged May 18, 1985 beating of John LaMonte; and

Non-parties William Knoedelseder and Dan Moldea having been subpoenaed by defendants to testify at that hearing; and

Knoedelseder and Moldea having moved to quash the subpoenas served on them; and

The court having heard the testimony presented at the hearing held on March 10, 1988 and March 17, 1988; and

The court having reviewed the submissions and oral argument of the parties; and

Attorney representing the government on March 10, 1988, Donald Davidson, in response to a request by defense counsel that the government "produce the representative of the F.B.I. who spoke to the press," stated, "I will certainly *attempt* to find out through Mr. Repetto and Mr.

For the reasons stated in the court's opinion filed this date,

IT IS on this 6th day of May, 1988, hereby

ORDERED that the hearing held on March 10, 1988 and March 17, 1988 will not be reopened; and it is

FURTHER ORDERED that the motion of Knoedelseder and Moldea to quash the subpoenas served on them is GRANTED.

No costs.

Mahoney which agents *might* have spoken to these individuals, and if for ease or conveyance [sic] of the court and parties, I will make sure those individuals are here." (T. 3/10/88—legal argument at 73–74) (emphasis added).