JOURNAL ENTRY AND OPINION
{¶ 1} Appellant State of Ohio ("State") appeals the trial court's granting defendant-appellee Ronald Larkins' ("Larkins") motion for a new trial based on newly obtained evidence. We find no merit to this appeal and affirm.
 {¶ 2} The incident leading to Larkins' arrest occurred on May 28, 1981, at the Euclid Loan Company, a pawnshop located in Cleveland. On that day, a shooting and robbery occurred resulting in the death of the owner. The Cuyahoga County Grand Jury returned an indictment for aggravated murder, attempted murder, and aggravated robbery against Wendell Johnson, Monika Henderson, and "Road Dog" — "RNU" — (real name unknown). After identifying Larkins, a.k.a. Seth Yellan, as "Road Dog," the grand jury returned a new indictment in 1986 against Larkins for the three crimes.
 {¶ 3} At trial, Henderson testified that she entered the pawnshop first with Johnson, while Larkins waited in the car. A few minutes later, Larkins entered with a gun and stated, "Don't anybody move. This is a hold-up!" The store owner fired his gun and Larkins and Johnson returned fire. Larkins and Johnson fled the scene in Johnson's Cadillac, leaving Henderson behind. She hitchhiked back to her aunt's house where Larkins and Johnson later returned. Henderson learned that the owner of the pawnshop had been killed and that Johnson had been shot in the arm. Henderson fled to Michigan with Johnson.
 {¶ 4} Henderson was "tired of running" so she turned herself in to the police in December 1981. She acknowledged that Larkins was introduced to her as "Road Dog" and she only became aware of his true name through the police. She pled guilty to voluntary manslaughter for her involvement in the incident and agreed to testify against her co-defendants. She testified that she did not have any felony or misdemeanor convictions other than the one manslaughter conviction associated with the instant case. She also testified that she was not promised anything in exchange for her testimony.
 {¶ 5} Johnson's girlfriend, Mary Carter, also testified for the prosecution. She claimed that she was present when Johnson and Larkins planned the robbery. Although she had known Johnson for approximately three years, she had only known Larkins for a week before arriving in Cleveland in May 1981.
 {¶ 6} On the morning of May 28, Carter was in a third floor bedroom with Larkins and Johnson when the three discussed robbing a pawnshop. Although she was supposed to participate in the robbery, Johnson told her that he was taking Henderson instead.
 {¶ 7} Carter further testified that she was present when Larkins and Johnson returned from the pawnshop. She observed that Johnson had been shot in the arm. That evening, she went to Akron with Larkins and they traveled to Colorado by bus the following morning. While on the bus, Larkins told her that the owner of the pawnshop had been killed and that his son had been shot in the head.
 {¶ 8} Carter returned to Michigan in January 1982 and turned herself in to the police. She provided a statement naming Larkins, Johnson, and Henderson as the perpetrators of the robbery.
 {¶ 9} Larkins was found guilty of aggravated murder during the commission of an aggravated robbery, aggravated robbery, and attempted murder. He was sentenced to life imprisonment, and his conviction was affirmed on October 8, 1987, in Cuyahoga App. Nos. 52779-52780.
 {¶ 10} Following his conviction, Larkins filed a writ of mandamus in 1992, seeking the police records relied on by the State in his prosecution. This court dismissed Larkins' complaint and the Ohio Supreme Court affirmed this court's decision, on other grounds, in State ex rel.Steckman v. Jackson (1994), 70 Ohio St.3d 420.[1]
 {¶ 11} In 1999, Bishop Alfred Nickles of Cincinnati filed a public records request with the Cleveland Police Department, seeking the same police reports previously denied to Larkins. Without any objection by the prosecutor's office, the Cleveland Police Department gave him the documents. Bishop Nickles forwarded the records to Larkins, who in turn, sought leave to file a motion for a new trial.
 {¶ 12} The police records revealed that: 1) the description of the robbers given by eyewitnesses did not match Larkins; 2) a description of "Road Dog," the second shooter, given by potential suspect Todd Hicks did not match Larkins; 3) the police relied on a confidential informant; 4) a witness, Sonja Belcher, who was present when the robbery was planned, did not identify Larkins as one of the planners, and said she saw both robbers after it was known Larkins left town; 5) Henderson named Larkins only after the police told her that Larkins was known by the nickname, "Road Dog;" and 6) Henderson lied on the stand concerning her past criminal convictions. Moreover, it was also discovered that Henderson lied when asked whether the State had promised her anything in exchange for her testimony. Although Henderson claimed she was testifying without any promises from the State, Assistant Prosecutor Marino wrote a letter on her behalf to the parole board, indicating that he promised her that he "would do everything possible to help her get off parole" because she was initially reluctant to return to Ohio to testify at trial.
 {¶ 13} After conducting a hearing on the matter, the trial court granted Larkins' motion for a new trial. The trial court concluded that the exculpatory evidence in the prosecution's possession which was never turned over to Larkins, warranted a new trial pursuant to the United States Supreme Court decision in Brady v. Maryland (1963), 373 U.S. 83.
 {¶ 14} The State appeals the trial court's decision and raises three assignments of error.
 Application of Steckman {¶ 15} The State argues in its first assignment of error that the trial court erred by granting Larkins' motion for a new trial based on the documents obtained by Bishop Nickles through R.C. 149.43 ("public records act") when Larkins had previously been denied access to the records by the Ohio Supreme Court in Steckman, supra. We disagree.
 {¶ 16} The Ohio Supreme Court held in Steckman that information not subject to disclosure under Crim.R. 16 cannot be obtained through a public records request. 70 Ohio St.3d at 420. The Steckman Court addressed the narrow issue of mandamus and whether there was a clear legal duty to produce certain records pursuant to R.C. 149.43, when the same documents had never been provided through discovery in the underlying criminal case. The Ohio Supreme Court, however, did not address the issue of whether exculpatory evidence existed in the police records requested by Larkins because that issue had never been raised.
 {¶ 17} In its opinion granting Larkins' leave to file a motion for a new trial, the trial court correctly noted that Steckman "addresses only the duty to respond to defendant's request for certain documents, it addresses not at all, the admissibility of information contained in these documents at hearing." We also agree with the trial court's conclusion that "neither Steckman, nor its companion cases, provide an `exclusionary rule' for information obtained by lawful request — even if, as the State contends, it was not required to provide same under the law."
 {¶ 18} Accordingly, Steckman is inapplicable to the instant case. Here, Larkins lawfully obtained the police records. Contrary to the State's assertion, the trial court properly allowed Larkins to rely on information contained in the police records which constituted exculpatory evidence. Furthermore, the trial court correctly recognized that "exculpatory evidence is always discoverable." Brady v. Maryland (1963),373 U.S. 83; State v. Johnson (1988), 39 Ohio St.3d 48, syllabus paragraph four.
 {¶ 19} Moreover, we find that the State waived its right to object to the discovery of the police records because it placed the records in the public domain. See State ex. rel. Zuern v. Leis (1990),56 Ohio St.3d 20, overruled on other grounds (holding that voluntary disclosure precludes later claims that records are exempt from release as public records). Although the State objected to the release of the police records when Larkins first requested them, the State failed to raise any objection when Bishop Nickles later requested the same documents in 1999.
 {¶ 20} The State's first assignment of error is overruled.
Newly Discovered Evidence
 {¶ 21} In its second assignment of error, the State argues that the trial court erred by granting Larkins' motion for a new trial because Larkins knew of the evidence at the time of trial. We disagree.
 {¶ 22} A ruling on a motion for a new trial is within the trial court's discretion and will not be disturbed on appeal absent a showing of an abuse of discretion. State v. Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus. The term abuse of discretion connotes more than an error of law or judgment. It implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Rhode v. Farmer (1970),23 Ohio St.2d 82, 91.
 {¶ 23} Before granting a motion for a new trial upon newly discovered evidence in a criminal case, the trial court must determine that the new evidence:
"(1) discloses a strong possibility that it will change the result if anew trial is granted, (2) has been discovered since the trial, (3) issuch as could not in the exercise of due diligence have been discoveredbefore the trial, (4) is material to the issues, (5) is not merelycumulative to former evidence, and (6) does not merely impeach orcontradict the former evidence."
 {¶ 24} State v. Petro (1947), 148 Ohio St. 505, syllabus.
 {¶ 25} The State contends that the alleged newly discovered evidence relied on by Larkins was provided to his defense counsel at trial and, therefore, fails to satisfy the third element of Petro. In support of this argument, the State relies on the testimony of Carmen Marino, the prosecuting attorney who handled Larkins' case, Ralph DeFranco, one of Larkins' defense attorneys, and Albert Giuliani, a criminal defense attorney in Cleveland, wherein all attested to the "open" discovery policy of Marino.
 {¶ 26} Although all three witnesses attested to the general "open" discovery practice of Marino, not one directly testified regarding the specific conduct of Marino in the instant case. Both Marino and DeFranco testified they had no independent recollection of what was provided in discovery but rather, it was the habit and custom of Marino to be "open" in discovery, to read police reports, and to allow defense counsel to look at the file.
 {¶ 27} Unlike the State, Larkins offered direct evidence through the testimony of his other defense attorney, Frank Kozelka, who affirmatively stated that he had never been provided this evidence at the time of trial. Moreover, it was elicited upon cross-examination of DeFranco, that had he known the facts contained in the police report, he would have followed up on them in his own investigation and incorporated the evidence into the defense. Here, none of the facts contained in the police report were used at trial.
 {¶ 28} We agree with the trial court's ruling that "all the direct evidence, and the circumstantial evidence that the exculpatory facts in the police reports were not used at trial, overwhelms the State's circumstantial evidence of Mr. Marino's `habit and custom.'" As stated inUnited States v. Stifel (N.D.Ohio 1984), 594 F. Supp. 1525, "Finally, the most persuasive indication that the defense did not possess this evidence is the fact that the defense never used this evidence at trial."
 {¶ 29} The State's second assignment of error is overruled.
Brady Violation
 {¶ 30} The State argues in its third assignment of error that the trial court erred in granting Larkins' motion for a new trial based on the State's alleged violation of Brady v. Maryland (1963), 373 U.S. 83. The State specifically contends that the information contained in the police records is not "material" to Larkins' defense and would not have changed the outcome of his case.
 {¶ 31} The United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, supra, at 87. See, also, State v. Johnston (1988),39 Ohio St.3d 48, 60. The State of Ohio requires a prosecuting attorney, upon motion of the defendant before trial, to disclose to the defendant all known evidence "favorable to the defendant and material to either guilt or punishment." Crim.R. 16(B)(1)(f). The Brady Court spoke of such evidence as that which "would tend to exculpate" the defendant. Brady, supra, at 88.
 {¶ 32} Suppression of exculpatory evidence by the prosecution violates due process only where that evidence creates a reasonable doubt as to the guilt of the accused. Wagster v. Overberg, (6th Cir. 1977)560 F.2d 735, 739. The mere possibility that the evidence might have helped the defense does not establish "materiality." Wagster,560 F.2d at 741.
 {¶ 33} The Ohio Supreme Court declared that "the key issue in a case where exculpatory evidence is alleged to have been withheld is whether the evidence is material." Johnston, 39 Ohio St.3d at 60. The court noted that such evidence will be deemed material only if there is a "reasonable probability" that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Id. at 61 (quoting United States v. Bagley (1985), 473 U.S. 667.) See, also,State v. Apanovitch (1995), 107 Ohio App.3d 82, 92. The Bagley court noted that a "reasonable probability" is one sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682. See, also,Apanovitch, 107 Ohio App.3d at 92. Moreover, a reviewing court should consider the cumulative effect of all nondisclosures in determining whether reversal is required. Kyles v. Whitley (1995), 514 U.S. 419. Whereas each bit of omitted evidence standing alone may not be sufficiently material to justify a new trial, the net effect, however, may warrant a new trial. Id. at 434.
 {¶ 34} The June 19, 1981 police report and July 17, 1981 statement of Todd Hicks reveal that Hicks gave a description of "Road Dog" as: "five foot, seven inches tall, weighs 175 pounds, has brown skin, and wears his hair in a permanent, straight back." This was the first description given to the police of "Road Dog," but it was not provided to defense counsel prior to trial. Because Larkins is a six-foot, one-inch tall, light-skinned black male who appears Hispanic, Hicks' description contradicts the State's identification of Larkins as "Road Dog."
 {¶ 35} Additionally, Hicks' statement alleged that Johnson, Henderson, and "Road Dog" were at Hicks' house the night of May 28. However, at trial, Mary Carter testified that she and Larkins left Cleveland the day of the robbery. Hicks never mentioned seeing Mary Carter. If Carter is to be believed, Larkins was not the person at Hicks' house because he was on his way to Denver with Carter. At a minimum, this evidence could have been used to impeach Carter on the stand. See Gigliov. United States (1972), 405 U.S. 150, 154 (holding impeachment evidence falls within the Brady rule).
 {¶ 36} Although the State provided Larkins' defense counsel Hicks' name as a potential witness, the State never disclosed the exculpatory information contained in Hicks' statement. See Brady, supra. Similarly, the State never informed Larkins' defense counsel of the nature of Sonja Belcher's statement which contradicted Carter's statement, implicated Hicks as being "Road Dog," and provided a possible alibi for Larkins. This information clearly undermines the confidence of the verdict.
 {¶ 37} Likewise, the State failed to reveal that all the eyewitness descriptions obtained from people present at the pawnshop differed from Larkin's appearance and even Henderson's description. Two of the eyewitness statements indicated that the perpetrators were clean-shaven and dark-skinned and never mentioned that either perpetrator wore a nylon stocking on his head. Contrary to these statements, Henderson stated that Larkins wore a nylon stocking and was light-skinned with a heavy mustache. Moreover, twelve of the eyewitnesses interviewed did not identify Larkins' photo as one of the perpetrators.
 {¶ 38} In addition, the record reveals that Henderson lied when asked if the prosecution had promised her anything in exchange for her testimony. Whereas the prosecution clearly had promised to write to the parole board on her behalf in exchange for her testimony, Henderson failed to reveal this when questioned. Furthermore, Henderson lied regarding her past criminal convictions. The police records indicated that she had prior convictions, so the prosecution should have been aware that her statement was false. We find there is a reasonable likelihood that Henderson's perjured testimony affected the judgment of the trial court and, therefore, Larkins is entitled to a new trial. See, U.S. Agurs (1976),427 U.S. 97 (holding that if prosecution's case included perjured testimony, then tainted conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury).
 {¶ 39} Given that there was no physical evidence from the crime scene that specifically linked Larkins to the murder and robbery, this court is reluctant to hold that the exculpatory evidence withheld from the defense would not have changed the outcome of the trial to a reasonable probability. Bagley, supra at 682. Rather, the cumulative effect of the withheld evidence is sufficiently material to justify a new trial. Kyles, supra at 434. The exculpatory evidence withheld not only questions the credibility of Henderson and Carter — the State's main witnesses — but it also questions the identity of "Road Dog." Accordingly, we find the trial court did not abuse its discretion in granting Larkins' motion for a new trial.
 {¶ 40} The State's third assignment of error is overruled.
Judgment affirmed.
Frank D. Celebrezze, Jr., P.J. and Anthony O. Calabrese, Jr., J. Concur
[1] Steckman is a combination of three cases — one of which involves Larkins, dealing with the use of R.C. 149.43 ("public records act") to obtain police reports and records.