[Cite as *State v. Noling*, 2014-Ohio-1339.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# PORTAGE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2011-P-0018** |
| TYRONE LEE NOLING, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Portage County Court of Common Pleas, Case No. 95 CR 220.

Judgment: Vacated and remanded.

*Victor V. Vigluicci,* Portage County Prosecutor, and *Pamela J. Holder,* Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Timothy Young*, Ohio Public Defender, and *Randall L. Porter,* Assistant State Public Defender, 250 East Broad Street, Suite 1400, Columbus, OH 43215-9308; and *James A. Jenkins,* 1370 Ontario Street, Suite 2000, Cleveland, OH 44113; and *Ralph I. Miller,* Weil, Gotshal & Manges LLP, 1300 Eye Street, N.W., Suite 900, Washington, DC 20005 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1} Appellant, Tyrone Lee Noling, appeals from the judgment of the Portage County Court of Common Pleas, denying him leave to file a motion for a new trial pursuant to R.C. 2945.80, Crim.R. 33(A)(6), and Crim.R. 33(B). At issue is whether the trial court erred in concluding appellant failed to establish, by clear and convincing evidence, he was unavoidably prevented from discovering the exculpatory evidence

upon which his motion for leave was premised. For the reasons that follow, we vacate the trial court's judgment and remand the matter for further proceedings.

{¶2} On August 18, 1995, the Portage County Grand Jury indicted appellant for his involvement in the murders of Bearnhardt and Cora Hartig. The indictment charged appellant with two counts of aggravated murder, with each count including specifications of aggravating circumstances pursuant to R.C. 2929.04(A)(3) and 2929.04(A)(7). Appellant was additionally indicted on two counts of aggravated robbery and one count of aggravated burglary. All charges included a firearm specification alleging appellant possessed a firearm on or about his person or under his control while committing the offenses.

{¶3} After trial, the jury entered a verdict of guilty on all counts, including the charged specifications. The trial court then entered the penalty phase after which the jury returned a recommendation that the court impose the death penalty. The trial court independently concluded that the death penalty was warranted and entered the sentence on record. The court also ordered appellant to serve consecutive sentences for the remaining three counts and for the firearm specifications. Appellant appealed his convictions, assigning 15 errors for this court's review. Appellant's challenges included evidentiary rulings, suppression issues, alleged sentencing defects, errors in jury instructions, and issues related to evidential sufficiency. In *State v. Noling*, 11th Dist. Portage No. 96-P-126, 1999 Ohio App. LEXIS 3095 (June 30, 1999) (*Noling I*), this court affirmed the trial court's judgment of conviction.

{¶4} Appellant appealed this court's decision to the Supreme Court of Ohio advancing 21 propositions of law, encompassing the same issues argued to this court

2

as well as additional constitutional challenges. In *State v. Noling,* 98 Ohio St.3d 44, 2002-Ohio-7044, the Supreme Court affirmed appellant's conviction and sentence. Appellant then filed a petition for writ of certiorari with the United States Supreme Court, which was denied in *Noling v. Ohio*, 539 U.S. 907 (2003).

{¶5} On July 23, 1997 appellant filed a petition for postconviction relief pursuant to R.C. 2953.23. In his petition, appellant asserted various claims for relief, including: (1) actual innocence, (2) prosecutorial misconduct, (3) withholding of exculpatory evidence, and (4) ineffective assistance of counsel. The trial court considered appellant's claims and issued a decision on April 9, 1998, dismissing appellant's petition, concluding there were no substantive grounds for relief. Appellant subsequently appealed the trial court's dismissal to this court. *See State v. Noling,* 11th Dist. Portage No. 98-P-0049, 2003-Ohio-5008 (*Noling II*).

{¶6} In *Noling II,* appellant asserted a combination of procedural and substantive arguments. With respect to the latter, appellant asserted the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide him with alleged police reports of a purse-snatching incident in which he and his co-defendants were involved on the day of the murder. This court determined such reports, even if they did exist, were not material to the outcome of the case because "appellant and the other individuals could have committed both the murders and the purse snatching" given the relative time-frames of the crimes. *Noling II*, at ¶54.

{¶7} Appellant further claimed actual innocence of the crimes based upon affidavits filed by his co-defendants recanting their previous testimony. This court reviewed appellant's three co-defendants' trial testimony, each of which directly

3

inculpated appellant as the triggerman in the Hartig murders. This court further considered the affidavits in which each co-defendant denied their own, as well as appellant's, involvement in the murders. *Id.* at ¶35-42. This court then determined:

{¶8} the trial court properly gave due deference to the affidavits filed in support of appellant's claim for actual innocence, and in the sound exercise of discretion, properly weighed their credibility. The affidavits recant prior testimony and rely on hearsay, or both. Moreover, considering the affiants' affiliation with appellant and with each other, and their direct interest in the success of appellant's efforts, the affidavits were not sufficient to establish substantive grounds for postconviction relief. *Id.* at ¶43.

{¶9} This court consequently affirmed the trial court in *Noling II* and the Supreme Court declined to review the matter. *See State v. Noling,* 101 Ohio St.3d 1424, 2004-Ohio-123.

{¶10} On June 30, 2004, appellant commenced a federal habeas corpus action in the Northern District of Ohio. While the action was pending, the Cleveland Plain Dealer published an article premised upon appellant's case. The article's heading read: "Lies put man on death row, three claim Portage investigator used coaching, threats to get confessions, men say." The record indicates the Plain Dealer was able to obtain various pieces of evidence via a public records request. Subsequent to the article, appellant filed, inter alia, a successive petition for postconviction relief and motion for new trial. Appellant moved the Northern District to stay his habeas action and hold the matter in abeyance pending exhaustion of his actual innocence claims in the state court.

4

The Northern District denied both motions; the petition remained active, but the matter did not proceed to resolution until early 2008, after the trial court had disposed of appellant's successive petition for postconviction relief and motion for new trial.

{¶11} Meanwhile, in the Portage County Court of Common Pleas, appellant asserted multiple grounds for relief in his successive petition and motion for new trial, all of which could be classified into one of three categories: (1) *Brady* evidence pertaining to alleged suppressed exculpatory material; (2) ineffective assistance of counsel relating to evidence that trial counsel possessed at trial, but failed to utilize; and (3) evidence in the form of post-trial affidavit testimony. After considering the arguments, the trial court dismissed appellant's successive petition and motion for new trial finding the evidence failed to meet the standards for granting a new trial or successive petition for postconviction relief. Appellant then appealed the trial court's decision to this court. *See State v. Noling*, 11th Dist. Portage No. 2007-P-0034, 2008-Ohio-2394 (*Noling III*).

{¶12} In *Noling III*, this court determined the alleged *Brady* evidence, which consisted of, inter alia, purportedly withheld grand jury transcripts and police summaries of interviews and investigative notes, was either available or could have been discovered prior to the filing of his successive petition for postconviction relief. *Id.* at ¶64. And, this court held, even if appellant could establish he was unavoidably prevented from discovering it, the newly discovered evidence, in its totality, failed to show, by clear and convincing evidence that, but for the suppression, no reasonable fact finder would have found appellant guilty. *Id.* This court further determined appellant's allegations of ineffective assistance of counsel and the post-trial affidavit

testimony failed to clearly and convincingly establish prejudice. *Id.* at ¶65-84. The trial court's judgment was therefore affirmed. *Id.* at ¶114.

{¶13} During the pendency of *Noling III*, the Northern District issued a 101-page memorandum opinion and order denying appellant relief in habeas corpus. *See Noling v. Bradshaw*, 2008 U.S. Dist. LEXIS 7650 (N.D. Ohio, Jan. 31, 2008). The district court determined, in relevant part, appellant's actual innocence claim relating to the lack of physical evidence tying him to the murders was procedurally defaulted. *Id.* at *46-*55. The court further determined that appellant failed to establish that this court's determination in *Noling II,* that his co-defendants' affidavits recanting their trial testimony were not credible in light of their clear interest in appellant's exoneration, was an unreasonable finding of fact under the circumstances. *Id.* at *55-*68. The court also observed that, taking the affidavits as credible would require accepting appellant's co-defendants had absolutely no involvement in the murders notwithstanding the fact that they were able to supply investigators with significant details about how the murders occurred. In the district court's view, such a conclusion was unreasonable under the circumstances. As a result, the Northern District concluded, the affidavits did not exculpate appellant or indicate he was "probably innocent." Instead, they merely served to contradict, rather than undermine, the testimony received at trial. *Id.* at *69.

{¶14} On June 21, 2010, appellant filed a motion for leave to file a new trial motion in the Portage County Court of Common Pleas pursuant to Crim.R. 33(A)(6) and R.C. 2945.80. The motion was premised upon evidence, which appellant characterized as newly discovered and materially exculpatory. The evidence included: (1) a statement from one Nathan Chesley, which inculpated Chesley's now-deceased foster

6

brother, Dan Wilson, in the Hartig murders (Wilson was executed in 2009 for an unrelated 1991 aggravated murder conviction); (2) DNA evidence from a cigarette butt that was found in the Hartig's driveway during the murder investigation, which previously excluded appellant, but did not similarly exclude Dan Wilson; and (3) statements made by one Marlene VanSteenberg, potentially implicating her brother-in-law, Raymond VanSteenberg in the Hartig murders. The foregoing evidence was obtained through a public records request to the Portage County Sheriff's Department and, according to appellant, was neither in the prosecutor's "open file" nor otherwise disclosed to defense counsel.

{¶15} The trial court ordered an evidentiary hearing, which took place on February 18, 2011. In its March 2, 2011 judgment, the trial court observed that, prior appellant's trial, the state of Ohio had an open file discovery policy. The court noted that appellant's defense counsel testified they had no recollection of evidence submitted in support of appellant's motion for leave to file. The prosecuting attorney, however, testified he provided full discovery of everything in his possession. Given these points, the court determined that appellant failed to establish, by clear and convincing evidence, that he was unavoidably prevented from discovering the exculpatory evidence at issue. Appellant's appeal of this judgment is now before this court.

{¶16} During the pendency of the instant appeal, the Sixth Circuit Court of Appeals released its opinion and judgment affirming the Northern District's judgment in appellant's habeas action. *See Noling v. Bradshaw*, 651 F.3d 573 (6th Cir.2011). In that opinion, the Sixth Circuit additionally considered appellant's motion for leave to file a successive habeas petition. Appellant apparently requested the Sixth Circuit to allow

7

him to file a second petition based upon the same evidence at issue in the instant appeal. The court determined, even assuming appellant could establish a *Brady* violation, and further assuming appellant could not have discovered the facts earlier with due diligence, the evidence failed to establish, in light of the totality of the evidence, that no reasonable factfinder would find him guilty. *Id.* at 577. The Sixth Circuit therefore denied appellant's motion.

{¶17} Appellant assigns two errors for this court's review. His first assignment of error provides:

{¶18} "The trial court erred in applying the Ohio Revised Code [Sec.] 2945.80's requirement that a defendant demonstrate by 'clear and convincing proof' that he was unavoidably prevented from discovering the evidence upon which his motion for new trial is based to Noling's request for leave to file a new trial motion."

{¶19} Appellant contends that R.C. 2945.80, which requires a defendant to establish, by clear and convincing evidence, that he or she was unavoidably prevented from discovering the evidence upon which his or her new trial motion is based, is unconstitutional. To wit, appellant asserts *Brady* evidence is inherently undiscoverable; as such, once a prima facie *Brady* case has been advanced, a defendant need only establish that the absence of the exculpatory evidence deprived him or her of a fair trial. Appellant consequently asserts R.C. 2945.80, which, in appellant's view, requires a heightened quantum of evidential proof than that required to establish a *Brady* violation, unconstitutionally restricts a defendant's right to assert a *Brady* claim. We need not reach the merits of this issue because appellant waived it for purposes of appeal.

8

{¶20} Counsel, during his closing remarks, stated: "We also believe under the *Brady* standard, your Honor, that actually imposing a special burden on us is probably unconstitutional. But we don't have to reach that issue because we think we have met the burden * * *."

{¶21} Counsel merely indicated his belief that the standard was unconstitutional, without argumentation. He then stated that it was unnecessary for the court to consider the issue because, in his estimation, the burden was met. Counsel's preliminary statement raised the issue, at least in some form; his secondary statement, however, withdrew the issue from consideration. By withdrawing the issue, counsel voluntarily waived the constitutional argument. *See State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. (Failure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal.)

{¶22} Appellant's first assignment of error lacks merit.

{¶23} His second assignment of error provides:

{¶24} "The trial court abused its discretion when it denied Noling leave to file his new trial motion."

{¶25} Crim.R. 33(B) sets forth the procedure for filing an untimely motion for a new trial and anticipates a two-step process. *State v. Valentine*, 11th Dist. Portage No. 2002-P-0052, 2003-Ohio-2838, ¶9. First, the defendant must establish, by clear and convincing proof, that he or she was unavoidably prevented from discovering the

9

evidence upon which he or she must rely. Crim.R. 33(B). Next, the defendant must file the motion within seven days of the trial court's determination. *Id.*

**{¶26}** "A party is unavoidably prevented from filing a motion for new trial if the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 145-146 (10th Dist.1984).

**{¶27}** Before addressing appellant's arguments under this assigned error, we shall first provide a sketch of the evidence appellant advanced in support of his motion for leave.

**{¶28} I. Blood-type evidence and affidavits indicating Dan Wilson as an alternate suspect.**

**{¶29}** Appellant contends the prosecution failed to disclose evidence that defense counsel could have used at trial to support an alternative-suspect defense. He asserts the prosecution withheld results from a blood-typing test of a cigarette butt found at the scene. According to the report, the genetic material found on the cigarette did not match appellant or his co-defendants; it did not, however, exclude Dan Wilson.

**{¶30}** Appellant also contends the prosecution failed to provide defense counsel with a statement made by Nathan Chesley inculpating his foster brother, Dan Wilson, as a potential suspect in the Hartig murders. Police notes taken several weeks after the Hartig murders reveal that Chesley made a statement to investigators that his brother "did it." In 2010, Chesley filed an affidavit in which he described his relationship with Wilson. He averred Wilson was a heavy drinker who had a bad temper and was prone

10

to fighting. Chesley also averred he was "sure" Wilson was breaking into private homes in 1990 and stealing money. Although Chesley could not remember making a statement to police regarding the Hartig murders, he did not deny doing so. And, given his knowledge of Wilson, Chesley stated he believed the murders were crimes Wilson "was capable of and likely committed."

**{¶31} II. New evidence detailing additional, separate potential suspect.**

**{¶32}** Appellant further contends the state withheld material evidence relating to another individual who, near the time of the murders, had engaged in suspicious activity with a .25 caliber handgun. The .25 caliber automatic weapon used in the Hartig murders was never recovered.

**{¶33}** Several days after the murders, investigators interviewed Larry Clemetson; Raymond VanSteenberg; and Dennis VanSteenberg, Raymond's son. Each of the interview reports included details about a missing .25 caliber automatic weapon. The prosecution disclosed these interview reports to defense counsel, but according to appellant, it did not disclose a statement given by Marlene VanSteenberg, Raymond's sister-in-law.

**{¶34}** On April 1, 1991, nearly a year after the murders, Ms. VanSteenberg visited the Portage County Sheriff's Office to retrieve a .25 caliber gun that belonged to her and her husband, Richard VanSteenberg. The weapon was at the Sheriff's Office because Raymand VanSteenberg, Richard's brother, had turned the gun in to police the day after the Hartigs' bodies were discovered. Ballistics tests were conducted on the weapon, which demonstrated the VanSteenberg's gun was not the murder weapon.

11

While at the Sheriff's Department, however, Ms. VanSteenberg provided a statement about how Raymond obtained possession of her gun.

{¶35} According to Ms. VanSteenberg's statement, on April 8, 1990, her husband informed her that Raymond had borrowed the weapon. Ms. VanSteenberg also stated that, on the same evening, she received a call from Raymond. He was at the Portage County Sheriff's Department and explained he had turned in the gun he borrowed. He asked Ms. VanSteenberg to tell investigators that he had the weapon in his possession for at least three to four months prior. Ms. VanSteenberg declined to do so. She knew Raymond had a gun and asked what happened to it. According to Ms. VanSteenberg, Raymond stated he had to throw it out because he "just had to do it."

{¶36} Ms. VanSteenberg additionally stated that, on April 9, 1990, after hearing about the Hartig murders, she contacted Detective Don Doak and told the officer about her conversation with Raymond.

{¶37} In her statement, Ms. VanSteenberg further mentioned a conversation that she had with one Shelton Morris, her husband's boss, approximately one month after Raymond's April 8, 1990 phone call. She stated that Morris knew someone who was riding in Raymond's truck near a skating rink when Raymond's son, Dennis, picked up a gun that was kept in the vehicle and threw it out the window. Appellant contends that neither the handwritten notes nor typed copies of Ms. VanSteenberg's statement were provided to trial counsel.

{¶38} **Analysis**

{¶39} Appellant raises several specific arguments in support of his position that the trial court erred in denying him leave to file his motion for a new trial. Preliminarily,

12

appellant argues the trial court erred in truncating the proceedings by disallowing the testimony of certain subpoenaed witnesses. We do not agree.

{¶40} The witnesses, Nathan Chesley, Kenneth Amick, and Marlene Dobosh (formerly VanSteenberg) were subpoenaed to testify regarding the substance of the exculpatory evidence in support of the actual motion for new trial. Because the evidence at issue was documentary, the court determined the exhibits spoke for themselves and any testimony regarding their content would be superfluous. Moreover, the only issue before the court below was whether appellant would be granted *leave* to file the motion for new trial, not the substantive *Brady* issues at stake if such leave was granted. Because the testimony of these witnesses had no bearing on whether appellant was unavoidably prevented from discovering the exculpatory evidence at issue, the court did not abuse its discretion in concluding the testimony of the foregoing witnesses was unnecessary.

{¶41} Next, appellant asserts the trial court erred in overruling his motion for leave merely because the prosecutor utilized an open-file discovery policy. Appellant contends that, even though the state maintained the evidence was available to appellant, there was no particular evidence specifically demonstrating the items were in the file given to defense counsel. Moreover, each of appellant's defense attorneys stated they did not recall seeing the evidence when they were preparing for trial. Appellant underscores that "'[t]he most persuasive indication that the defense did not possess this evidence is the fact that the defense never used this evidence at trial.'" *State v. Larkins*, 8th Dist. Cuyahoga No. 82325, 2003-Ohio-5928, ¶28, quoting *United States v. Stifel*, 594 F.Supp. 1525 (N.D.Ohio 1984). Because it is disputable whether

13

the evidence was in the file given to defense counsel, appellant maintains, at the least, further inquiry is necessary to establish whether it was in the file. Hence, appellant concludes, the trial court erred when it premised its denial merely on the existence of the prosecutor's open-file discovery policy.

{¶42} At the evidentiary hearing, Assistant Prosecutor Eugene Muldowney testified that, although he was not directly involved with the prosecution of appellant's original 1992 indictment, defense counsel acknowledged they had received copies of numerous items during discovery in that case and would not require duplicate discovery of that material. Mr. Muldowney testified, after appellant's second indictment, he supplemented the discovery with other, albeit undisclosed, items. Among the materials copied during discovery were items described as "Miscellaneous Hartig papers;" "Miscellaneous: reports – calendar – personal papers;" and "Blood analysis reports." No evidence was offered, however, regarding the specific content of these materials.

{¶43} Mr. Muldowney testified he reviewed all the files and met with the Sheriff to make certain everything was placed into binders and given to defense counsel. He also testified appellant's original trial team, Attorney George Keith and Attorney Pete Cahoon, visited the Portage County Prosecutor's Office on more than one occasion to review the prosecutor's file. He additionally recalled a singular meeting with Attorney Keith and maybe Attorney Cahoon at the Justice Center to review exhibits in the Sheriff's possession. Mr. Muldowney stated that defense counsel was given access to the Sheriff's file at that meeting. Mr. Muldowney further testified that, while the prosecutor's office had separate files for each co-defendant, the Sheriff's Office had only one file for the entire case.

14

**{¶44}** Mr. Keith testified he made two discovery demands, pursuant to *Brady*. And the record reflects that the second demand sought "[a]ny information tending to show that other persons, excluding the accused, were involved in the crime." Mr. Keith testified he assumed the prosecutor provided everything exculpatory relating to potential alternative suspects. Mr. Keith stated, however, he did not recall seeing the evidence at issue. And, given appellant's defense of actual innocence, Mr. Keith underscored he would have remembered any evidence relating to an alternative suspect or suspects. He emphasized that identity of the murderer was the entire issue in the case and any evidence suggesting an alternative suspect would have been "paramount."

**{¶45}** Mr. Keith also underscored that he was unaware that Dan Wilson was a suspect in the Hartig murders, despite various articles appearing in local papers discussing the investigation. Mr. Keith explained he did not conduct discovery through the newspaper; he testified, however, had the matter been brought to his attention, he would have addressed it.

**{¶46}** Mr. Cahoon similarly testified that he thought the prosecutor's open file provided everything relating to appellant's case, particularly in light of the specific demand set forth in Mr. Keith's motion. Mr. Cahoon recalled receiving all "paper discovery" from the prosecutor's office "pre-copied." He recalled, however, visiting either the prosecutor's office or the Sheriff's office to review physical evidence.

**{¶47}** Mr. Cahoon also testified he was unaware of any newspaper articles spotlighting Dan Wilson as a suspect in the Hartig investigation. Like Mr. Keith, he stated he did not conduct discovery via newspaper and, in any event, Mr. Cahoon testified, he thought full discovery had been provided.

15

{¶48} From the foregoing evidence, the trial court found the prosecutor utilized an open-file discovery policy and that Mr. Muldowney gave defense counsel everything in his possession to defense counsel. The court also found that, even though defense counsel could not recall seeing the evidence at issue, which was culled from the Sheriff's file in a public records request, they had the opportunity to inspect the file in the Sheriff's possession. Based upon the foregoing findings, the trial court concluded appellant failed to demonstrate, by clear and convincing evidence, that he was unavoidably prevented from discovering the exculpatory evidence.

{¶49} The trial court's analysis is problematic to the extent it assumes the exculpatory evidence at issue was part of the open file given to defense counsel prior to trial. The factual testimony received at the hearing, however, does not, given the state of the current record, necessarily support this conclusion. The evidence adduced at the hearing demonstrated that the prosecutor's office kept separate files for each co-defendant charged in the Hartig murders. The Sheriff, however, kept one file for *all* investigative material relating to the Hartig murders. Mr. Cahoon testified the defense team received a pre-copied version of all documentary discovery *from the prosecutor's office*.

{¶50} Furthermore, although Mr. Muldowney testified he recalled taking defense counsel to the Sheriff's Office to review items vis-à-vis appellant's prosecution, he specifically testified this visit was primarily for "reviewing exhibits." Mr. Cahoon further recalled going either to the prosecutor's office or the Sheriff's Office to review only "physical evidence." This recollection is supported by Mr. Keith's and Mr. Cahoon's mutual testimony that they believed all documentary evidence was disclosed in light of

16

their discovery requests and, as a result, neither attorney believed any further inspection of documents would be redundant.

{¶51} The exculpatory evidence at issue was obtained through a public records request issued to the Portage County Sheriff's Department. Appellant sought records relating to the investigation and prosecution of his co-defendants, Gary St. Clair and Joseph Dalesandro. Even though Mr. Muldowney testified all materials pertaining to appellant's prosecution were provided to defense counsel, it is reasonably possible, given the testimony, that the evidence obtained in the public records request made it into appellant's co-defendants' files at the prosecutor's office, but was never specifically transferred into appellant's file.

{¶52} Moreover, the record suggests that the Sheriff's file was, in some sense, organized or itemized according to each co-defendant, despite Mr. Muldowney's testimony that the Sheriff kept one large investigatory file that included all materials relating to the Hartig murders. That is, appellant represents, and the state does not contest, the public records request, from which appellant obtained the disputed evidence, specifically sought information relating to the prosecution and investigation of St. Clair and Dalesandro. This indicates that, even if all the investigatory materials were kept in the same spatial area or were combined in some fashion, the evidence in question may not have been included in every co-defendant's portion of the investigatory file. And, if the evidence at issue was only in the St. Clair and Dalesandro portions of the file, defense counsel would have no obligation or reasonable need to examine these portions of the file, even if it was available.

**{¶53}** Given the foregoing, there is a reasonable factual dispute as to whether the evidence at issue was in the documentary file that was pre-copied and given to defense counsel. There is also a reasonable dispute regarding whether defense counsel could have, with reasonable diligence, discovered the evidence in the Sheriff's file. Resolution of these factual questions is necessary to fully and fairly dispose of the issue of whether appellant was unavoidably prevented from discovering the exculpatory evidence upon which his *Brady* claim is based.

**{¶54}** The foregoing analysis finds support in *United States v. Alexander*, 748 F.2d 185 (4th Cir.1984). In that case, the Fourth Circuit considered the *Brady* claim of a doctor convicted of submitting fraudulent claims to multiple insurers, including Medicaid and the military health plan. The doctor's pretrial discovery request broadly sought "all documents 'which refer or relate to the claim forms of Blue Cross/Blue Shield.'" *Id.* at 191. The government had control of a Blue Cross/Blue Shield patient survey which, among other things, contained "patient responses * * * concerning whether services * * * submitted [for payment] * * * had actually been performed." *Id.* The survey revealed that only 13 out of 48 patients reported the submitted services had *not* been performed. *Id.* Following the doctor's conviction, he again requested the survey or, alternatively, the identity of the patients surveyed. *Id.* at 192.

**{¶55}** Attempts to obtain voluntary disclosure failed, and the district court denied a motion for discovery. *Id.* Before hearing the doctor's motion for new trial, the government represented to the doctor that it never had the survey results in its possession. *Id.* During the hearing, however, the government changed its stance, telling the court that it *did* in fact have the survey results at the time the doctor

18

requested them; and, the government submitted, it had given the doctor access to the survey results in files open for the doctor's counsel to inspect. *Id.* On appeal, during oral argument, the government retrenched, representing that Blue Cross/Blue Shield maintained control of the survey at the relevant time. *Id.* In an investigative case summary submitted at the court's request, however, the Fourth Circuit then learned that the government did have the survey materials at the relevant times. *Id.*

{¶56} The Fourth Circuit determined "the Government's equivocation in making critical factual representations to defense counsel and to the district court concerning its possession of certain of the requested materials fatally compromised the integrity of the proceedings on the new trial motion." *Id.* at 191. Accordingly, the Fourth Circuit remanded to the district court, directing it to reconsider the doctor's motion for new trial. *Id.*

{¶57} Significantly, the Fourth Circuit entered its order, despite some question regarding whether the survey actually constituted *Brady* material, noting "that neither the defendant, nor this court, nor the district court could properly address that question without inspecting the survey responses and related * * * materials that the Government now presumably concedes it has had in its possession all along." *Id.* at 193. The court consequently concluded that, because a factual issue existed as to whether a *Brady* violation occurred, the defendant was "entitled to have it determined by the district court in a hearing appropriate to the factual inquiry." *Id.* The Fourth Circuit therefore vacated the trial court's judgment and remanded the matter for further proceedings to resolve, in light of the additional evidence, the factual issue and enter judgment, in view of the entire record, on whether a *Brady* violation occurred.

19

**{¶58}** We acknowledge that *Alexander* is distinguishable from this case in several respects. First, *Alexander* dealt directly with a *Brady* issue; this case, alternatively, relates to the issue of whether appellant was unavoidably prevented from discovering potential *Brady* evidence. Moreover, the prosecution in this case did not equivocate or make inconsistent statements regarding the status of the evidence. Rather, its position has been firm throughout; namely, that the evidence was always in the open file or otherwise accessible. Still, the holding in *Alexander* underscores that, under certain circumstances, justice requires a court to go beyond gridlocked testimonial representations and explore, in greater detail, whether actual facts support a party's claim for relief or, as here, a defendant's attempt to seek relief.

**{¶59}** *Alexander* and this matter are similar in that both involve disputed factual questions which were not fully explored in the trial court. And, in this matter, like *Alexander*, additional evidence must be taken to completely inform the court's decision on whether, as a matter of fact, the evidence at issue was or was not in the file received by or offered to defense counsel. These issues were explored only by way of testimony of the lawyers involved. Nothing in the transcript of proceedings suggests the prosecutor's file was examined. This is crucial because, according to Mr. Cahoon, all documentary discovery received by defense counsel came from this file. And, even though Mr. Muldowney testified the Sheriff compiled one file for all co-defendants, it is less than clear what this means, especially when the public records request isolated particular documents from appellant's co-defendant's investigative files at the Sheriff's office.

**{¶60}** Given the foregoing, we hold further proceedings are necessary to determine whether the evidence at issue was part of the open file or otherwise available through the Sheriff's materials at the time of trial. This conclusion renders appellant's claim relating to the trial court's failure to consider the impact of his actual innocence and ineffective assistance of counsel claims unripe at this time.

**{¶61}** As a final observation, we note that the dispute under consideration could have been avoided through a production and receipt process in which all documentary evidence is coherently listed and signed for at the time of discovery. In a huge case, this might be viewed as an overly time-consuming waste of prosecutorial resources; such a system, however, would eliminate the problems engendered in the instant case and potentially be a useful tool in warding off post-conviction, *Brady*-oriented challenges in the future. As this case illustrates, the system in place, while not ineffective, has serious pitfalls.

**{¶62}** Appellant's second assignment of error has merit to the limited extent discussed in the foregoing analysis.

**{¶63}** For the reasons discussed in this opinion, the judgment of the Portage County Court of Common Pleas is vacated and the matter is remanded to the trial court for the purpose of taking further evidence on the issues outlined above.

COLLEEN MARY O'TOOLE, J., concurs,

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

21

_____

DIANE V. GRENDELL, J., dissents with a Dissenting Opinion.

{¶64} The narrow issue before this court is whether Noling is entitled to file a motion for new trial.

{¶65} Criminal Rule 33(B) provides that a motion for new trial based on newly discovered evidence must be filed "within one hundred twenty days after the day upon which the verdict was rendered," unless "[i]t is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely."

{¶66} The standard of "clear and convincing evidence" is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368, 481 N.E.2d 613 (1985).

{¶67} "A motion for new trial pursuant to Crim.R. 33(B) is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion." *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus.

{¶68} In the present case, Noling's evidence falls far short of creating a firm belief or conviction that he was unavoidably prevented from the discovery of the

22

evidence on which he would base a motion for a new trial. The majority essentially acknowledges this fact but, rather than affirming the trial court's exercise of its discretion to deny the motion, reverses the lower court for "further proceedings * * * to determine whether the evidence at issue was part of the open file or otherwise available through the Sheriff's materials at the time of trial." *Supra* at ¶ 59. In effect, the majority is providing Noling a second opportunity to satisfy the burden of proof that he failed to satisfy at the first hearing.

{¶69} Noling claims that the State failed to provide certain, allegedly exculpatory documents in discovery at the time of his trial in 1995. It is undisputed that the State provided open file discovery during the course of Noling's case, supplied defense attorneys with copies of files, and allowed defense attorneys to inspect files. The only possible explanation that supports Noling's claim is that the documents at issue were not in the prosecutor's or the sheriff's files.[1] The only evidence to support this explanation is that neither of Noling's defense attorneys at trial could recall seeing the documents.

{¶70} After a period of over fifteen years, the testimony of Noling's defense attorneys is hardly remarkable. Neither attorney, however, could state with certainty that the documents were not provided in discovery. Rather, they are unable to recall whether or not the documents existed in discovery. Attorney Keith further testified that his records of the Noling case were destroyed by a burst water pipe. Attorney Cahoon

---

1. The possibility that the prosecutor purposefully withheld the documents exists, but is scarcely credible. The import of the documents is that there was another possible perpetrator, Daniel Wilson, of the Hartig murders. However, it was widely reported in the newspapers that Wilson was suspected of killing the Hartigs. It was noted, with illustrative maps, that Wilson was staying about a mile away from the Hartigs at the time of their murder and that Wilson had a history of violent behavior. It makes no sense that prosecutors would try to conceal Wilson's identity from defense attorneys when his existence was public knowledge.

testified his files from the Noling case exist, but that he did not review them to determine whether the documents at issue were included.

{¶71} Similarly, Assistant Prosecutor Muldowney testified that everything in the State's files was made available to defense attorneys, but he could not guaranty with certainty that these particular documents were included. Over the course of time, the files are no longer in the condition that they were in 1995.

{¶72} Thus, there is no real evidence that Noling's defense attorneys were not provided the documents at issue in or prior to 1995. Noling's argument rests on the following deductions: if his attorneys had the documents, they would have used them; or, if his attorneys had the documents and did not use them, they would have rendered constitutionally ineffective assistance. Neither syllogism clearly or convincingly establishes that Noling was unavoidably prevented from the discovery of these documents, particularly in light of the facts that the State provided open file discovery, Wilson's existence as a suspect was public knowledge, defense attorneys knew that saliva from the cigarette butt excluded Noling and his accomplices, and the murder weapon had never been recovered.

{¶73} The majority recognizes that these issues "were not fully explored in the trial court." *Supra* at ¶ 58. However, the burden on these issues was Noling's, not the trial court's nor the State's. Since Noling failed to meet this burden, the trial court's judgment should be affirmed. Accordingly, I respectfully dissent.